JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
*jakro@kslaw.com*
CARTER L. GEORGE (Bar No. 308775)
*cgeorge@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:    (213) 443-4310

KATHLEEN E. MCCARTHY (*pro hac vice*)
*kmccarthy@kslaw.com*
KENNETH FOWLER (*pro hac vice*)
*kfowler@kslaw.com*
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone:   (212) 556-2100
Facsimile:    (213) 556-2222

Attorneys for Defendant AMGEN INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDOZ INC.,<br><br>    Plaintiff,<br><br>        v.<br><br>AMGEN INC.,<br><br>    Defendant. | Case No. 2:22-cv-05326-RGK-MAR<br><br>**DEFENDANT AMGEN INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT [FED. R. CIV. P. 56]; MEMORANDUM OF POINTS AND AUTHORITIES**<br>Date:          Monday, June 26, 2023<br>Time:          9:00 a.m.<br>Place:          Courtroom 850<br>**Filed Concurrently:**  L.R. 56-1 Statement of Uncontroverted Facts and Conclusions of Law; Declaration of Joseph N. Akrotirianakis and Exhibits; [Proposed] Findings of Fact and Conclusions of Law; [Proposed] Judgment |

**REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

**TO THE COURT AND PLAINTIFF AND ITS COUNSEL:**

**PLEASE TAKE NOTICE** that, on June 26, 2023, at 9:00 a.m., or at such other date and time convenient to (and ordered by) the Court, in Courtroom 850 of the Roybal Federal Building and U.S. Courthouse, 255 E. Temple Street, 8th Floor, Los Angeles, California, 90012, Defendant Amgen Inc. ("Amgen" or "Defendant"), will, and hereby does, move this Court under Federal Rule of Civil Procedure 56 and Local Rule 56 to enter judgment in favor of Amgen against Plaintiff Sandoz Inc. ("Sandoz" or "Plaintiff") with respect to each of the claims alleged in Sandoz's complaint. This motion is based on the absence of evidence to support required elements of Sandoz's claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), including the absence of evidence that Amgen's allegedly false promotional materials injured Sandoz and the absence of evidence that would support any entitlement to injunctive relief.

This Motion is based on this Notice of Motion and the attached Memorandum of Points and Authorities; the concurrently filed declaration of Joseph N. Akrotirianakis and the exhibits appended thereto; any other evidence received in connection with the hearing on this motion; all matters of record in the Court's files in this action; and such other evidence and written or oral argument as the Court may wish to consider and direct the parties to submit.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on May 16, 2023.

Dated: May 24, 2023                     KING & SPALDING LLP


                                        By:  */s/Joseph N. Akrotirianakis*
                                             JOSEPH N. AKROTIRIANAKIS

                                        Attorneys for Defendant AMGEN INC.

1

# <u>TABLE OF CONTENTS</u>

2

I.    INTRODUCTION.................................................................................................1

II.   FACTUAL BACKGROUND ............................................................................2

    A.   Amgen Develops Neulasta® and Neulasta® Onpro®.................................2

    B.   Neulasta® Biosimilar Competition Begins....................................................5

    C.   Sandoz Launches Ziextenzo® Late ███████ ...........................................5

    D.   Sandoz Ignores Its Own Internal Analysis and Sues Amgen........................8

III.  LEGAL STANDARD ........................................................................................9

IV.   ARGUMENT ...................................................................................................10

    A.   Summary Judgment Is Proper on Sandoz's Lanham Act Claims for Damages
    and Disgorgement and UCL and FAL Claims Because Sandoz Cannot Prove
    Injury Caused by Amgen's Promotional Materials.......................................10

        1.    There is No Evidence Sandoz Was Injured by Amgen's Promotional
        Material..................................................................................................11

        2.    Sandoz Is Not Entitled to a Presumption of Injury. .............................15

        3.    Sandoz's Failure to Prove Injury Precludes It from Recovering
        Damages or Disgorgement under the Lanham Act and Forecloses Its
        UCL and FAL Claims. ..........................................................................16

    B.   Summary Judgment Is Proper on Sandoz's Claims for Injunctive Relief
    Because Sandoz Cannot Prove a Likelihood of Future Injury Caused by
    Amgen's Promotional Materials. ................................................................18

V.    CONCLUSION ................................................................................................19

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allergan USA Inc. v. Imprimis Pharm., Inc.*,
  2019 WL 12661090 (C.D. Cal. May 16, 2019)....................................................14

*Allergan USA Inc. v. Imprimis Pharm., Inc.*,
  2019 WL 3029114 (C.D. Cal. July 11, 2019) ...................................................18

*Biocell Tech. LLC v. Arthro-7*,
  2013 WL 12063914 (C.D. Cal. May 22, 2013)....................................................17

*BMMG, Inc. v. Am. Telecasat Corp.*,
  42 F.3d 1398 (9th Cir. 1994) ...........................................................................12

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................2, 9

*City of Oakland v. Wells Fargo & Co.*,
  14 F.4th 1030 (9th Cir. 2021) ...........................................................................18

*CKE Rest. v. Jack in the Box, Inc.*,
  494 F. Supp. 2d 1139 (C.D. Cal. 2007)..............................................................16

*Falcon Stainless, Inc. v. Rino Cos.*,
  2011 WL 13130703 (C.D. Cal. Oct. 21, 2011) ................................................16

*Grasshopper House, LLC v. Clean & Sober Media, LLC*,
  2021 WL 3702243 (9th Cir. Aug. 20, 2021) .........................................12, 14, 17

*Harper House, Inc. v. Thomas Nelson, Inc.*,
  889 F.2d 197 (9th Cir. 1989) ...................................................................*passim*

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011).................................................................................10, 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)................................................................................11, 12, 18

*McCrary v. Elations Co.*,
  2014 WL 12561600 (C.D. Cal. Dec. 8, 2014)....................................................18

*Munchkin, Inc. v. Playtex Prods., LLC*,
  2012 WL 12886205 (C.D. Cal. Oct. 4, 2012) ....................................................16

*Nutrition Distrib. LLC v. IronMag Labs, LLC*,
  2018 WL 6264986 (C.D. Cal. Nov. 16, 2018) ...................................................17

*Nutrition Distrib. LLC v. Lecheek Nutrition, Inc.*,
  2015 WL 12659907 (C.D. Cal. June 5, 2015)....................................................18

*Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.*,
  2012 WL 12893690 (C.D. Cal. May 11, 2012)....................................................16

*Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*,
  2011 WL 4852472 (C.D. Cal. Oct. 12, 2011) ....................................................15

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
  2020 WL 4747724 (S.D. Cal. Aug. 17, 2020).................................12, 16, 18, 19

*Quidel Corp. v. Siemens Med. Solutions USA, Inc.*,
  2021 WL 4622504 (9th Cir. Oct. 7, 2021) .......................................10, 15, 17, 18

*Robinson v. Best Price Distribs., LLC*,
  2022 WL 4596601 (C.D. Cal. Aug. 12, 2022) ..................................................13

*Telecredit Serv. Corp. v. Elec. Trans. Corp.*,
  974 F.2d 1343, at *2 (9th Cir. 1992) ...............................................................12

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) .................................................................10, 15, 17

*Van Patten v. Vertical Fitness Grp.*,
  847 F.3d 1037 (9th Cir. 2017) ........................................................................18

*VBS Distrib., Inc. v. Nutrivita Labs., Inc.*,
  811 F. App'x 1005 (9th Cir. 2020)...................................................................11

*Verisign v. XYZ.COM LLC*,
  848 F.3d 292 (4th Cir. 2017) .....................................................................12, 17

*Wall & Assocs., Inc. v. Better Business Bureau of Cent. Va., Inc.*,
  685 F. App'x 277 (4th Cir. 2017).....................................................................12

*Williams & Cochrane, LLP v. Rosette*,
  2022 WL 4544711 (S.D. Cal. Sept. 27, 2022) ............................................18, 19

DEFENDANT AMGEN INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

**Statutes**

42 U.S.C. § 262(k) ................................................................................................ 1, 5

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................. 2, 9

DEFENDANT AMGEN INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

2

**I.    INTRODUCTION**

3    More than 20 years ago, Amgen developed a landmark biologic, Neulasta®, to

4    help chemotherapy patients avoid life-threatening infections.  Twelve years later,

5    Amgen improved on Neulasta® by developing the Onpro® kit, an "on-body injector"

6    that allows already very sick chemotherapy patients to receive Neulasta® without

7    having to make additional trips to a doctor's office, medical clinic, or hospital the day

8    following chemotherapy.  The innovation of Onpro® increased the number of patients

9    who receive Neulasta® at the optimal time, in accordance with the label (compliance),

10    and limits their exposure to other sick people, which in turn reduces their rates of

11    infection and keeps them on their prescribed chemotherapy regimen (dose intensity).

12    Sandoz manufactures Ziextenzo®, an FDA-approved "biosimilar" for which

13    Amgen's Neulasta® is the "reference" biologic.[1]  ███████████████████████

14    initial sales performance of Ziextenzo® following its product launch.  █████████

15    ████████████████████████████████████████████████  ████████

16    ████████████████████████████████████████████████████████

17    ███████████████████████████████  For many months after Ziextenzo®'s

18    launch, Sandoz ████████████████████████████████████████

19    ██████████████████████████████████████.  For *years* after

20    its launch, ████████████████████████████████████████████

21    ██████████████████.  And Ziextenzo® cannot be delivered by an on-body injector, so

22

23    ────────────────────

24    [1] Biologic products are unlike conventional drugs in that they "are isolated from a

25    variety of natural sources: human, animal, or microorganism." (Dkt. 1 ¶ 17.)  FDA

26    approval of a biologic is based upon submission of a biologics license application

27    ("BLA").  (Dkt. 1 ¶ 18.)  Federal law permits the approval of a biologic that is

28    "biosimilar" to an FDA-approved "reference" biologic product. (Dkt. 1 ¶ 19.)  FDA

approval of a biosimilar is based upon submission of an abbreviated BLA ("aBLA").

(Dkt. 1 ¶ 24.)  Under federal law, a biologic product has twelve years of marketing

exclusivity. 42 U.S.C. § 262(k)(7)(A).

it lacks the advantages of Neulasta® Onpro®—a deficiency that was particularly glaring during the COVID-19 pandemic, when immunocompromised chemotherapy patients could not safely travel to healthcare facilities.  Instead of accepting that these factors led to Ziextenzo®'s sluggish uptake, Sandoz filed this lawsuit, ███████████ ███████████ was somehow caused by Amgen promotional materials based on two "real world evidence" studies, referenced in the Complaint (Dkt. 1) as the "2019 Amgen Study" and the "2021 Amgen Study."

Fact discovery has closed, and it is clear that Sandoz has no evidence to support essential elements of its claims against Amgen at a trial.  To obtain any monetary relief, Sandoz must prove it lost sales of Ziextenzo® *because of* Amgen's allegedly false promotional materials.  But Sandoz has no evidence that any patient, prescriber, or payer *ever* used, prescribed, or paid for Neulasta® Onpro® in lieu of Ziextenzo® as a result of Amgen's promotions.  In the absence of such evidence of injury, Amgen is entitled to judgment as a matter of law on Sandoz's claims for monetary relief.  Nor can Sandoz establish entitlement to the injunctive relief it seeks, because promotional materials based on what Sandoz alleges as the "2019 Amgen Study" have not been used in commercial advertising or promotion since 2021, and Sandoz has no evidence that it is likely to be harmed by promotional materials based on what Sandoz alleges as the "2021 Amgen Study."  For these reasons, no trial is necessary, and the Court should grant summary judgment in favor of Amgen.

## II.    FACTUAL BACKGROUND

### A.    Amgen Develops Neulasta® and Neulasta® Onpro®.

Chemotherapy is cytotoxic, meaning that it kills cancer cells as well as normal cells, which dramatically reduces a patient's neutrophils, a type of white blood cell that helps the body fight infections.  (Declaration of Joseph N. Akrotirianakis ("Akro. Decl.") Exh. B at 44, 46[2] [Campbell Tr. 77:7-12, 79:18-20].)  Patients receiving such

---

[2] References to the pages of the exhibits to the accompanying declaration of counsel

chemotherapy are susceptible to febrile neutropenia, a life-threatening infection. (Akro. Decl. Exh. A at 20 § 14.1; Exh. B at 46 [Campbell Tr. 79:21-23].)

To address this problem, Amgen developed filgrastim, a biologic product approved by the Food and Drug Administration ("FDA") in 1991 and sold under the brand name Neupogen®. (Akro. Decl. Exh. A at 7.) Neupogen® is a granulocyte colony-stimulating factor ("G-CSF"). (Akro. Decl. Exh. A at 17 § 11.) Neupogen® stimulates neutrophil production and thereby decreases the incidence of infection in cancer patients undergoing chemotherapy. (Akro. Decl. Exh. A at 12 § 5.11.)

Innovative as it was, filgrastim requires daily injections for up to two weeks. (Akro. Decl. Exh. A at 3 § 2.1.) So Amgen innovated a long-acting G-CSF known as pegfilgrastim and sold under the brand name Neulasta®, which FDA approved in 2002. (Akro. Decl. Exh. C at 57; Exh. D at 84 [RFA 14].) Neulasta®, like Neupogen®, reduces the risk of infection in patients receiving cytotoxic chemotherapy by stimulating the production of neutrophils. (Akro. Decl. Exh. C at 57, 73.) Studies show Neulasta® reduces the risk of febrile neutropenia by more than 94 percent. (Akro. Decl. Exh. E at 96.)

Neulasta® improved upon Neupogen® because it is long-acting and requires only one injection at the end of each chemotherapy cycle, rather than daily injections for up to two weeks. (*Compare* Akro. Decl. Exh. A at 9 § 2.1, *with* Exh. C at 59 § 2.1.) At the time FDA approved Neulasta®, the sole delivery device was a pre-filled syringe ("PFS")—a disposable syringe that comes pre-filled with Neulasta®. (Dkt. 1 ¶ 37.) For Neulasta® to be optimally effective, it must be administered at least 24 hours *after* the completion of a chemotherapy cycle. The FDA-approved label for Neulasta® thus instructs that it *not* be "administer[ed] . . . between fourteen days before and 24 hours after administration of cytotoxic chemotherapy." (Akro. Decl. Exh. C at 57.)

---

refer to the consecutive pagination of the declaration and exhibits. For ease of reference, internal page and line numbers are also provided for deposition transcript exhibits.

DEFENDANT AMGEN INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

FDA's instruction that Neulasta® be given no less than 24 hours after chemotherapy generally requires discharged cancer patients to return to their healthcare facility the day following chemotherapy. But this can be challenging for patients for many reasons, including:

- Immunocompromised chemotherapy patients may not want to return to a healthcare facility due to the risk of viral (or other) infections.
- The chemotherapy may cause a patient to feel too weak and/or nauseous to make the trip to the clinic.
- A patient might live far away from the healthcare facility, which adds to the time spent driving, the cost of transportation, the time away from work, and the additional housing costs of staying near the clinic overnight if required. Even if a patient lives nearby, she may not have access to transportation other than taxi, rideshare, or public transit, potentially exposing the patient to even more people with communicable diseases.
- A patient might have scheduling conflicts with work or family obligations.
- Weather conditions, such as snow, ice, fog, or severe rainstorms, may prevent a patient from traveling the day following a chemotherapy cycle.

(Akro. Decl. Exh. F at 102-103.)

Problems also arise for oncologists, who must have appropriate staff available on weekends or the holidays to administer Neulasta® PFS at the right time. (Akro. Decl. Exhs. F at 103.) An oncologist would accordingly be required to plan a patient's chemotherapy regimen so that the last day of each cycle did not fall one day before the healthcare facility will be closed or when the patient has an unavoidable conflict. And even then, patients may not arrive at the right time—or at all—putting the patient at risk and making ongoing cancer treatments more difficult and less effective. These are just some of the "next day" challenges that can limit compliance (and, therefore, effectiveness) when pegfilgrastim is delivered through a pre-filled syringe.

So Amgen innovated again. It developed a means to deliver Neulasta® through

an "on-body injector"—Onpro®—which a health care professional applies to the patient's arm or abdomen on the last day of chemotherapy. (Akro. Decl. Exh. C at 60, § 2.4.)  The following day, 27 hours after the device is set, the injector automatically administers the required dose of Neulasta®. (Akro. Decl. Exh. C at 60, § 2.4.)  This automated injection eliminates the "next day" compliance challenges created by requiring a patient to return to the healthcare facility.  FDA approved Amgen's on-body injector, Onpro®, in December 2014. (Akro. Decl. Exh. D at 84 [RFA 16].)

### B.  Neulasta® Biosimilar Competition Begins.

When a drug company develops a medication as effective and valuable as Neulasta®, competitors often seek to follow the innovator into the market.  For biologic medications like Neulasta®, competition may occur through biosimilars, following the expiration of the marketing exclusivity period of the reference biologic.  42 U.S.C. § 262(k).  Biosimilars are biologic medications FDA has determined are clinically similar in safety and efficacy to an FDA-approved biologic like Neulasta®.  *See id.*

Biosimilars for Neulasta® began entering the U.S. market almost 18 months earlier than Sandoz's Ziextenzo®. (Akro. Decl. Exh. G at 123 [Delo 30(b)(6) Tr. 166:17-25].)  FDA did not approve Sandoz's Ziextenzo® until November 4, 2019. (Akro. Decl. Exh. D at 83-84 [RFA 13].)  FDA has since approved three additional biosimilars, so there are presently a total of six FDA approved biosimilars. (Akro. Decl. Exh. D at 85 [RFAs 20-21].)  All pegfilgrastim biosimilars are available only through a pre-filled syringe. (Akro. Decl. Exh. D at 86 [RFAs 23-24].)  Neulasta® Onpro® remains the only commercially available on-body injector. (Akro. Decl. Exh. D at 87 [RFA 27].)

### C.  Sandoz Launches Ziextenzo® Late ███████.

Sandoz first submitted its aBLA for FDA approval of Ziextenzo® in 2015. (Dkt. 1 ¶ 46.)  But FDA deemed Sandoz's application deficient and rejected it in June 2016. (Akro. Decl. Exh. D at 83 [RFAs 9-11].)  Addressing FDA's reasons for rejection took Sandoz almost three years, and Sandoz resubmitted its application on February 27,

2019.  (Akro. Decl. Exh. D at 83 [RFA 12].)  FDA approved Ziextenzo® on November 4, 2019.  (Akro. Decl. Exh. D at 83-84 [RFA 13].)

By that time, Neulasta® biosimilars offered by Mylan (Fulphila®) and Coherus (Udenyca®) had both already been on the market for almost a year.  (Akro. Decl. Exh. D at 85 [RFA 19]; Exh. G at 123 [Delo 30(b)(6) Tr. 166:17-25].)  This posed a serious problem for Sandoz,

(Akro. Decl. Exh. H at 146 ¶13; Exh. R at 255

. (Akro. Decl. Exh. I at 152 [Keefe Tr. 53:4-11].)

(Akro. Decl. Exh. J at 159-60, 162-64 [Thole Tr. 61:8-62:6, 76:20-78:18]; Exh. G at 114 [Delo 30(b)(6) Tr. 29:3-18]; Exh. K at 1.)

Ziextenzo®'s launch was plagued by multiple other issues.  For example, Ziextenzo® did not obtain a Healthcare Common Procedure Coding System "Q Code" from the Centers for Medicare & Medicaid Services ("CMS") until many months following the Ziextenzo® launch.  (Akro. Decl. Exh. L at 181 [RFA 60].)

(Akro. Decl. Exh. M at 192 [Frame Tr. 110:13-16].)

(Akro. Decl. Exh. K at 174.)

(Akro. Decl. Exh. M at 204-05 [Frame Tr. 183:23-184:8].)

1  ██████████████████████████████████████████████████████████████

2  ███████████████████████████████████ (Akro. Decl. Exh. K at 174.)

3  ████████████████████████████████ Because FDA approves biosimilars without

4  requiring manufacturers to conduct expensive clinical trials (Dkt. 1 ¶ 24), biosimilars

5  tend to be sold at a lower price than the FDA-approved biologic. ███████████████

6  ██████████████████████████████████████████████████████████████

7  ████████████████████ (Akro. Decl. Exh. J at 167 [Thole Tr. 205:13-18].) ████████

8  ██████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████████

10 ██████████████████ (Akro. Decl. Exh. O at 243.)

11 And then there was the COVID-19 pandemic, which disrupted life as we know

12 it, ██████████████████████████, a few months after Ziextenzo® entered the

13 market.  (Akro. Decl. Exh. M at 206-07 [Frame Tr. 185:9-186:2].)  The obvious and

14 well-publicized risks of COVID exposure in public spaces deterred patients from

15 traveling to healthcare facilities for treatment.  The risk of COVID-19 infection was

16 especially high for immunocompromised chemotherapy patients.  As a result, Amgen's

17 Onpro® injector device—which already provided advantages over a pre-filled syringe

18 as a delivery device—███████████████████████████████████████████

19 ███████████████████ (Akro. Decl. Exh. M at 195 [Frame Tr. 151:4-11]; Exh. J at

20 169-70 [Thole Tr. 219:20-220:25].) ████████████████████████████████

21 ██████████████████████████████████████████████████████████████

22 █████████████████████████ (Akro. Decl. Exh. M at 211 [Frame Tr. 198:5-22]; Akro

23 Exh. G at 126 [Delo 30(b)(6) Tr. 235:4-11.) ██████████████████████████

24 ██████████████████████████████████████████████████████████████

25 █████████████████████████████████████████████████ (Akro. Decl. Exh.

26 

27 _____

    [3] ████████████████████████████████████████████████████████

28 █████████████████ (Akro. Decl. Exh. N at 227 [Delo Tr. 175:20-24].)

M at 195, 199-200 [Frame Tr. 151:4-7, 157:19-158:21]; Exh. P at 246-47; Exh. Q at
250; Exh. R at 254-55.)

Finally, in Sandoz's own judgment, ███████████████████████

███ ████████████████████████████████████████

███████████████████████████████████████████

███████████ (Akro. Decl. Exh. S at 258.) Sandoz replaced the Ziextenzo® brand
team head, Alex Thole, in June 2020, and Sheila Frame, the head of Sandoz's entire
North American commercial organization, including biosimilar products, in November
2020. (Akro. Decl. Exh. N at 223, 224 [Delo Tr. 8:18-21, 9:1-3]; Exh. M at 189-90
[Frame Tr. 11:22-12:7].) No Sandoz sales personnel ever complained, even in internal
communications, that Ziextenzo®'s sales were affected by Amgen's promotional
material, and █████████████████████████████████████████

████████████████████████████████████ (Akro. Decl.
Exh. M at 214 [Frame Tr. 255:2-13].)

So if, as Sandoz has claimed, its Ziextenzo® sales ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ (Akro. Decl. Exh. G at 118-19 [Delo 30(b)(6) Tr. 77:15-78:1].)

**D.   Sandoz Ignores Its Own Internal Analysis and Sues Amgen.**

Ignoring its own extensive internal documents ██████████████████

██████████████████████████████ Sandoz filed this lawsuit against Amgen,
asserting Amgen was the cause of lost business. Sandoz claims some of Amgen's
promotional materials for Neulasta® Onpro® are false or misleading. In fact, Amgen's
promotions accurately summarized the results of two real world studies.

The first promotion (the "Retrospective Study promotion") summarized a

1  retrospective study of real-world data concerning rates of febrile neutropenia in patients
2  who received Neulasta® Onpro® and patients who received Neulasta® PFS.  (Akro.
3  Decl. Exh. T at 305-06.)  The second promotion (the "Prospective Study promotion")
4  summarized a prospective study that observed patients who qualified for G-CSF therapy
5  based on National Comprehensive Cancer Network guidelines.  (Akro. Decl. Exh. U at
6  308-09.)    The Prospective Study compared rates of febrile neutropenia in those
7  receiving Neulasta® through the Onpro® device and those treated with other febrile
8  neutropenia prophylaxis options.  (Akro. Decl. Exh. U at 308-09.)  The Prospective
9  Study promotion remains in use; Amgen stopped using the Retrospective Study
10  promotion in commercial advertising or promotion in 2021.  (Dkt. 1 ¶ 89; Akro. Decl.
11  Exh. B at 50-51, 53 [Campbell Tr. 160:20-161:1, 279:20-23].)

12      Neither of Amgen's promotional materials mentions Sandoz or Ziextenzo®.
13  (Akro. Decl. Exh. L at 182 [RFAs 77-78].)  There is no evidence that any patient,
14  prescriber, or payer relied on Amgen's promotions to Sandoz's detriment: Sandoz can
15  point to no evidence that it lost any Ziextenzo® sales to Neulasta® Onpro® because of
16  Amgen's promotions.  Nor has Sandoz conducted a survey relating to the Amgen
17  promotions.  Sandoz nonetheless sued Amgen for false advertising under the federal
18  Lanham Act, California False Advertising Law ("FAL"), and California Unfair
19  Competition Law ("UCL"), seeking damages, disgorgement, and injunctive relief.

20  **III.    LEGAL STANDARD**

21      Under Rule 56(a), summary judgment is appropriate where "there is no genuine
22  issue as to any material fact and the movant is entitled to judgment as a matter of law."
23  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When,
24  as here, the plaintiff bears the burden of proof on its claims, the defendant may prove
25  the "absence of a genuine issue of material fact" merely by "pointing out to the district
26  court . . . that there is an absence of evidence to support the [plaintiff's] case."  *Celotex*,
27  477 U.S. at 325.

28

## IV.  ARGUMENT

Amgen is entitled to summary judgment because, fact discovery now having closed, it is clear that Sandoz has no evidence to support an essential element of its claims: Injury.  Specifically, Sandoz has no evidence that it has suffered any injury caused by Amgen's allegedly false promotional materials.  That entitles Amgen to summary judgment on Sandoz's Lanham Act claims for damages and disgorgement, its UCL claim, and its FAL claim.  Similarly, Amgen is entitled to summary judgment on Sandoz's claims for injunctive relief because Sandoz has no evidence that it is likely to be harmed by Amgen's promotional materials in the future.  For these reasons, no trial is required, and the Court should enter judgment in Amgen's favor.

### A.  Summary Judgment Is Proper on Sandoz's Lanham Act Claims for Damages and Disgorgement and UCL and FAL Claims Because Sandoz Cannot Prove Injury Caused by Amgen's Promotional Materials.

For Sandoz to succeed on its Lanham Act claims for damages and disgorgement, its UCL claim, and its FAL claim, it must prove it suffered an injury caused by Amgen's allegedly false promotional materials.  In a "suit for damages under" the Lanham Act, "actual evidence of some *injury resulting from the deception* is an essential element of the plaintiff's case." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) (emphasis added).  The same is true when a plaintiff seeks disgorgement, which is inappropriate without "proof of past injury or causation." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011).  California's FAL and UCL likewise require a plaintiff to prove that its alleged "economic injury was the result of, i.e., caused by, the unfair business practice or false advertising." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011); *see Quidel Corp. v. Siemens Med. Solutions USA, Inc.*, 2021 WL 4622504, at *1 n.1, 2-3 (9th Cir. Oct. 7, 2021) (affirming summary judgment in favor of defendant on plaintiff's Lanham Act, FAL, and UCL claims for lack of injury).

Sandoz cannot make the requisite showing of injury.  Sandoz has no evidence

that any patient, physician, or insurer chose Neulasta® Onpro® over Ziextenzo® as a result of Amgen's allegedly false promotional materials.[4]  Nor is Sandoz entitled to a presumption of injury, since Amgen's promotions did not directly compare Neulasta® Onpro® with Ziextenzo®, and the relevant market has multiple competitors in addition to Amgen and Sandoz.  No trial is required, and the Court should summarily adjudicate Sandoz's claims for monetary relief.

### 1. There is No Evidence Sandoz Was Injured by Amgen's Promotional Material.

There is no genuine dispute of material fact concerning whether Sandoz can prove injury because no evidence exists from which a reasonable factfinder could conclude Sandoz lost any sales as a result of Amgen's allegedly false promotional materials.  *See VBS Distrib., Inc. v. Nutrivita Labs., Inc.*, 811 F. App'x 1005, 1007 (9th Cir. 2020) ("Summary judgment is . . . proper when the plaintiff fails to present any evidence of injury resulting from defendants' deception.").[5]

To prove lost sales caused by Amgen, Sandoz must introduce evidence that Amgen's promotional materials caused a patient, prescriber, or payer who otherwise would have taken, prescribed, or reimbursed Ziextenzo® to choose Neulasta® Onpro® instead.   It is not enough for Sandoz to prove patients, prescribers, or payers

---

[4] The intended audience for the promotion of the results of the Retrospective Study and the Prospective Study was prescribers and payers, and it is undisputed that the results of either study were never promoted to patients.  Sandoz alleges, however, that "[u]pon information and belief, Amgen has influenced physicians to prescribe, *patients to purchase and take*, and payers to reimburse Neulasta® Onpro® in lieu of Sandoz's Ziextenzo® as a result of Amgen's false and misleading advertising."  (Dkt. 1 ¶ 136 (emphasis added).)  For ease, this motion is framed with respect to the precise injury Sandoz alleges in the Complaint.

[5] Although a plaintiff may also prove injury through reputational harm, reputation is not at issue here because Amgen's allegedly false promotions do not refer to Sandoz or Ziextenzo® "by name" or "equat[e] [Ziextenzo®] with an inferior product." *Lexmark*, 572 U.S. at 138 (cleaned up).  Sandoz has no evidence of reputational harm in any event.

misinterpreted Amgen's materials (though, without a survey, Sandoz cannot do even that).  *See Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2020 WL 4747724, at *7 (S.D. Cal. Aug. 17, 2020) (holding plaintiff "confuse[d] the assertion that physicians received false or misleading advertising with the assertion that those physicians then took action . . . and this caused damage"), *aff'd*, 2021 WL 4622504.  Nor is it enough for Sandoz to prove it lost sales of Ziextenzo®—or even that it lost those sales to Neulasta® Onpro® (though Sandoz cannot do that either).   Instead, Sandoz must specifically prove a "causal connection" between its lost sales and "the defendant's advertising."  *Harper House*, 889 F.2d at 210; *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) (holding plaintiff must show "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations"); *Verisign v. XYZ.COM LLC*, 848 F.3d 292, 299 (4th Cir. 2017) ("To recover damages under the Lanham Act, [plaintiff] must show not only false advertising by [defendant], but also that [defendant's] statements caused [plaintiff] actual damages.").[6]

---

[6] *See also Grasshopper House, LLC v. Clean & Sober Media, LLC*, 2021 WL 3702243, at *2 (9th Cir. Aug. 20, 2021) (affirming summary judgment for defendant "because [p]laintiff had no evidence or witnesses it could present as to any actual damages that flowed from the false advertisement"); *Verisign*, 848 F.3d at 300-01 (affirming summary judgment for defendant because plaintiff did not prove its lost sales were "causally linked" to "false statements"); *Wall & Assocs., Inc. v. Better Business Bureau of Cent. Va., Inc.*, 685 F. App'x 277, 279 (4th Cir. 2017) (affirming dismissal of Lanham Act complaint because plaintiff did "not identify a single consumer who withheld or cancelled business with it or pointed to a particular quantum of diverted sales or loss of goodwill and reputation resulting directly from reliance on any false or misleading representations"); *BMMG, Inc. v. Am. Telecast Corp.*, 42 F.3d 1398 (Table), at *1 (9th Cir. 1994) (affirming summary judgment for defendant because plaintiff did "not link the loss of sales to the alleged deception"); *Telecredit Serv. Corp. v. Elec. Trans. Corp.*, 974 F.2d 1343 (Table), at *2 (9th Cir. 1992) (affirming summary judgment for defendant because plaintiff "offered no evidence whatsoever that any retailer quit using or failed to start using [its] services because of" false advertising); *Quidel*, 2020 WL 4747724, at *7 (granting summary judgment to defendant because plaintiff "produced no evidence of lost profits that resulted from false advertising towards physicians");

1   Sandoz has no evidence it lost even a single Ziextenzo® sale to Neulasta®

2   Onpro® as a result of Amgen's allegedly false promotional materials. ███████

3   ████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████

5   ██████████ (Statement of Uncontroverted Facts ("SUF") ¶ 1.)  And Sandoz has not

6   identified any document from its files—not one email, spreadsheet, presentation, or any

7   other evidence, whether or not admissible at trial—tending to prove it lost sales to

8   Amgen because of Amgen's promotions.

9   When pressed in discovery for any evidence of injury, all Sandoz has done is

10   reference Amgen documents that speak to other issues.  These documents, however, do

11   not provide any evidence of injury to Sandoz (*i.e.*, that a patient, prescriber, or payer

12   chose Neulasta® Onpro® over Ziextenzo®) because of Amgen's allegedly false

13   promotions—███████████████████████████████████████████████████████

14   ██████ (Akro. Decl. Exh. N at 229-33 [Delo Tr. 207:19-211:7]; Exh. G at 129-30, 131-

15   36, 138-40 [Delo 30(b)(6) Tr. 254:4-255:3, 256:8-261:6, 266:5-268:16]; Exh. V at 322-

16   23, 327, 328 [Li 30(b)(6) Tr. 207:4-208:4, 212:9-17, 213:6-14].)  ████████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ██████████ (*E.g.*, Akro. Decl. Exhs. W, X, Y.) ███████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ██████████████████████████ (Akro. Decl. Exhs. Z, AA.) ██████████████████

25   ████████████████████████████████████████████████████████████████████

26

27   *Robinson v. Best Price Distribs., LLC*, 2022 WL 4596601, at *2-3 (C.D. Cal. Aug. 12, 2022) (Klausner, J.) (dismissing Lanham Act counterclaim for failure to prove that

28   defendant lost customer's "*because of* [plaintiff's] false advertisements").



. (Akro. Decl. Exh. AA.)

(Akro. Decl. Exh. P at 246-47; Exh. BB at 421.)[7]

(Akro Decl. Exh. R at 1-2.)  With three other products already on the market, . (Akro Decl. Exh. R at 1-2.)

(Akro Decl. Exh. R at 1-2.)

(Akro. Decl. Exh. J at 167 [Thole Tr. 205:13-18].)

[7] That is another reason Sandoz cannot prove injury caused by Amgen's promotions. *See Grasshopper House*, 2021 WL 3702243, at *1-2 (affirming summary judgment to defendant because plaintiff's damages expert could not prove "causation of damages" because "he discounted competing causal factors without an adequate basis"); *cf. Allergan USA Inc. v. Imprimis Pharm., Inc.*, 2019 WL 12661090, at *1 (C.D. Cal. May 16, 2019) (excluding damages expert who "fail[ed] to attribute damages to any or even all of [defendant's] false ads, or to account [for] a handful of potential alternative factors").

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████  (Akro. Decl. Exh. M at 195, 196, 199-200 [Frame Tr. 151:4-7, 152:7-16,

6 157:19-158:21]; Akro Exh. G at 126 [Delo 30(b)(6) Tr. 235:4-11].)  None of these

7 issues has anything to do with the challenged Amgen promotional materials.

8            **2.**      **Sandoz Is Not Entitled to a Presumption of Injury.**

9        In the absence of any actual evidence of injury caused by Amgen's allegedly false

10 promotional materials, Sandoz has sought to invoke a *presumption* of injury.  But no

11 such presumption exists "[w]hen advertising does not directly compare defendant's and

12 plaintiff's products [or] when numerous competitors participate in a market." *Harper*

13 *House*, 889 F.2d at 209 n.8; *accord Quidel*, 2021 WL 4622504, at *2;

14 *TrafficSchool.com*, 653 F.3d at 826.  That is the case here, where Amgen's promotions

15 do not directly compare Neulasta® Onpro® to Ziextenzo®, and the market has

16 numerous competitors in addition to Sandoz and Amgen.

17        Amgen's promotional materials do not "directly compare" Neulasta® Onpro® to

18 Ziextenzo®.  *Quidel*, 2021 WL 4622504, at *2.  Amgen's promotions do not even

19 mention Ziextenzo®—or Sandoz.  (SUF ¶ 2.)  Rather the Retrospective Study

20 promotion compared Neulasta® Onpro® to Neulasta® PFS, and the Prospective Study

21 promotion compared Neulasta® Onpro® to other options including the entire category

22 of products without on-body injectors, which includes Neulasta® PFS, multiple

23 biosimilars other than Ziextenzo®, and other treatment options.  (Dkt. 1, Exhs. 1, 6.)

24 Courts have routinely rejected a presumption of injury for similar promotions.[8]

25 _____

26 [8] *E.g.*, *Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 2011 WL 4852472, at *3

27 (C.D. Cal. Oct. 12, 2011) (rejecting presumption because advertisement referred to "a
generic product or class of products"); *Out of the Box Enters., LLC v. El Paseo Jewelry*

28 *Exch., Inc.*, 2012 WL 12893690, at *13 (C.D. Cal. May 11, 2012) (rejecting

1    Nor are Amgen and Sandoz "in a two-player market." *Quidel*, 2020 WL 4747724,
2    at *11. At all times relevant to this lawsuit, there have been Neulasta® and at least three
3    (and as many as six) FDA-approved pegfilgrastim biosimilars. (SUF ¶ 3.) Courts reject
4    a presumption of injury in these circumstances, as well. *See Harper House*, 889 F.2d at
5    209 n.8 (finding presumption improper "when numerous competitors participate in a
6    market"); *Out of the Box*, 2012 WL 12893690, at *13 (rejecting presumption because
7    plaintiff and defendant were not "the only two [competitors] in a market"); *Falcon*
8    *Stainless*, 2011 WL 13130703, at *15 (rejecting presumption because defendant had
9    five competitors).

10    For these reasons, Sandoz is "not entitled to a presumption of injury." *Quidel*,
11    2020 WL 4747724, at *11. Sandoz must instead proffer "actual evidence" of injury.
12    *Harper House*, 889 F.2d at 210. As discussed above, it has not done so.

13    **3.    Sandoz's Failure to Prove Injury Precludes It from Recovering**
14    **Damages or Disgorgement under the Lanham Act and**
15    **Forecloses Its UCL and FAL Claims.**

16    Because of Sandoz's failure to prove any injury caused by Amgen's promotional
17    materials, Amgen is entitled to summary judgment on Sandoz's Lanham Act claims for
18    damages and disgorgement, its UCL claim, and its FAL claim.

19    First, "actual evidence of some *injury resulting from the deception* is an essential
20    element of" a "suit for damages" under the Lanham Act. *Harper House*, 889 F.2d at
21    210; *accord Quidel*, 2021 WL 4622504, at *2-3; *Grasshopper House*, 2021 WL

22    _____

23    presumption because advertisement did "not directly compare defendant's and
24    plaintiff's products" (cleaned up)); *Falcon Stainless, Inc. v. Rino Cos.*, 2011 WL
25    13130703, at *15 (C.D. Cal. Oct. 21, 2011) (rejecting presumption because
26    advertisement "made comparisons to five other products"), *aff'd*, 572 F. App'x 483 (9th
27    Cir. 2014); *Munchkin, Inc. v. Playtex Prods., LLC*, 2012 WL 12886205, at *5 (C.D.
28    Cal. Oct. 4, 2012) (rejecting presumption because advertisement "did not mention
[plaintiffs] by name"), *aff'd*, 600 F. App'x 537 (9th Cir. 2015); *CKE Rest. v. Jack in the
Box, Inc.*, 494 F. Supp. 2d 1139, 1146 (C.D. Cal. 2007) (rejecting presumption because
advertisements "merely refer to 'our competitor's product'").

DEFENDANT AMGEN INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

3702243, at *2; *Verisign*, 848 F.3d at 300-01.  Sandoz's failure to prove injury thus dooms its claim for damages under the Lanham Act.

Second, Sandoz's failure to prove injury also precludes it from disgorging Amgen's profits, since "[t]he Lanham Act allows an award of profits only to the extent the award 'shall constitute compensation and not a penalty.'" *TrafficSchool.com*, 653 F.3d at 831 (quoting 15 U.S.C. § 1117(a)).  Absent "proof of past injury or causation," there is "no way to determine with any degree of certainty what award would be compensatory."  *Id.*  Therefore, an "award of profits with no proof of harm" is "appropriate" only in limited circumstances, none of which exist here.  *Id.*  Such an award may be "appropriate in false *comparative* advertising cases, where it's reasonable to presume that every dollar defendant makes has come directly out of plaintiff's pocket."  *Id.* (emphasis added). But this is not a "false comparative advertising case[]" because Amgen's promotions do not "directly compare" Neulasta® Onpro® and Ziextenzo®.  *Id.*; *Quidel*, 2021 WL 4622504, at *2.  Disgorgement without proof of injury may also be appropriate when the "defendant associates its product with [the] plaintiff's noncompetitive product to appropriate good will or brand value." *TrafficSchool.com*, 653 F.3d at 831.  That is not what Sandoz alleges in this case, and such allegations would make no sense here, where Ziextenzo® came after and is based on Neulasta®.  Therefore, Sandoz cannot recover disgorgement without "*any* proof of past injury or causation."  *Id.*; *accord Nutrition Distrib. LLC v. IronMag Labs, LLC*, 2018 WL 6264986, at *2 (C.D. Cal. Nov. 16, 2018) (granting summary judgment to defendant on disgorgement for lack of injury); *Biocell Tech. LLC v. Arthro-7*, 2013 WL 12063914, at *11-12 (C.D. Cal. May 22, 2013) (same).

Finally, Sandoz cannot proceed with its UCL and FAL claims without evidence of injury.  Both statutes require proof of an "economic injury" that "was the result of, i.e., *caused by*, the unfair business practice or false advertising." *Kwikset*, 51 Cal. 4th at 322.  Because Sandoz cannot prove any injury "caused by" Amgen's promotional materials, its UCL and FAL claims fail as a matter of law.  *Id.*; *Quidel*, 2021 WL

4622504, at *1 n.1; *Quidel*, 2020 WL 4747724, at *4, 12; *accord Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1049 (9th Cir. 2017) (affirming summary judgment for defendant on UCL and FAL claims for failure to prove injury "caused by [d]efendants' conduct").

**B.    Summary Judgment Is Proper on Sandoz's Claims for Injunctive Relief Because Sandoz Cannot Prove a Likelihood of Future Injury Caused by Amgen's Promotional Materials.**

Sandoz seeks injunctive relief in addition to monetary relief, but it is not entitled to an injunction because it cannot show that it faces a "likelihood of future injury." *Lexmark*, 572 U.S. at 135; *Quidel*, 2020 WL 4747724, at *11 (cleaned up).  Nor can Sandoz show that Amgen's promotional materials would be the "proximate cause" of any future injury.  *Lexmark*, 572 U.S. at 127; *Williams & Cochrane, LLP v. Rosette*, 2022 WL 4544711, at *22-23 (S.D. Cal. Sept. 27, 2022); *cf. City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1042 (9th Cir. 2021) (stating "*Lexmark* uniformly applied the proximate cause test without making any distinction between the damages and injunctive relief claims").

First, Sandoz cannot show a likelihood of future injury caused by Amgen's Retrospective Study promotion because Amgen stopped using that promotion in commercial advertising or promotion in 2021.  (SUF ¶ 4.)  Sandoz has no evidence Amgen will ever use that promotion again.  Because the Retrospective Study promotion is "no longer being used" and Amgen has "no demonstrated intention of using [it] in the future," it cannot support an injunction.  *Nutrition Distrib. LLC v. Lecheek Nutrition, Inc.*, 2015 WL 12659907, at *7 (C.D. Cal. June 5, 2015) (citing *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1095 (C.D. Cal. 2001); *accord Allergan USA Inc. v. Imprimis Pharm., Inc.*, 2019 WL 3029114, at *3 (C.D. Cal. July 11, 2019) (denying injunction because defendant's "false statements [had] stopped"); *McCrary v. Elations Co.*, 2014 WL 12561600, at *6-7 (C.D. Cal. Dec. 8, 2014) (holding plaintiff lacked standing to seek injunction against allegedly false advertisements the defendant "no

longer utilize[d]").

Second, Sandoz cannot show a likelihood of future injury caused by Amgen's Prospective Study promotion because, as explained above, Sandoz has no evidence that any patient, prescriber or payer has ever chosen Neulasta® Onpro® over Ziextenzo® as a result of that promotion. *See* Section IV.A.1, above. Sandoz did not even conduct a survey regarding the challenged Amgen promotions. (SUF ¶ 5.) Nor does Sandoz have evidence of any other injury the Prospective Study promotion might cause. ███ ████████████████████████████████████████████████████████████████ (Akro. Decl. Exh. G at 118-19 [Delo 30(b)(6) Tr. 77:15-78:1].) Sandoz thus cannot prove it is likely to be harmed by the Prospective Study promotion in the future. *See Williams & Cochrane*, 2022 WL 4544711, at *22-23 (granting summary judgment on claim for injunctive relief because plaintiff could not "establish causation" or "likelihood of future injury"); *Quidel*, 2020 WL 4747724, at *11 (same, because plaintiff had no evidence of "monetary loss" and had "not argued that there is any loss beyond this").

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Amgen's motion and enter judgment in Amgen's favor on all of Sandoz's claims.


Dated: May 24, 2023                    KING & SPALDING LLP


                                       By:  */s/Joseph N. Akrotirianakis*
                                            JOSEPH N. AKROTIRIANAKIS

                                       Attorneys for Defendant AMGEN INC.

DEFENDANT AMGEN INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

2

3       The undersigned, counsel of record for Amgen Inc., certifies that this brief

4  contains 6,401 words, which complies with the word limit of L.R. 11-6.1.

5

6  Dated: May 24, 2023                KING & SPALDING LLP

7

8                                     By: */s/Joseph N. Akrotirianakis*

9                                          JOSEPH N. AKROTIRIANAKIS

10                                     Attorneys for Defendant AMGEN INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28